Chaim B. Book, Esq. (CB-4652)
M. Todd Parker, Esq. (MP-4548)
Moskowitz & Book, LLP
345 Seventh Avenue, 21st Floor
New York, New York 10001
(212) 221-7999

Attorneys for Plaintiffs

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y

★ MAY - 3 2012 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

G.D.S., a minor child, by his father and natural
guardian, Robert Slade,

                    Plaintiff,

      vs.

NORTHPORT-EAST NORTHPORT UNION
FREE SCHOOL DISTRICT, DR. MARYLOU
MCDERMOTT, Superintendent of Northport-
East Northport Union Free School District, and
IRENE MCLAUGHLIN, Principal of Northport
High School,

                  Defendants.

**CV 12 - 2191**
ECF Case

12 Civ.

**COMPLAINT**  SPATT, J.

**JURY DEMAND**  BROWN, M.J.

G.D.S., a minor child, by his father and natural guardian Robert Slade, brings this

civil rights action to redress the severe, persistent and violent harassment G.D.S. experienced at

school based on his religion in violation of his federal and state rights.

## PRELIMINARY STATEMENT

    1.    This case involved a school district's failure to keep one of its students

safe from verbal and physical harassment because of his religion.  Beginning in or around

November 2010, G.D.S.'s freshman year at Northport High School ("Northport High"), and

continuing through June 2011, G.D.S. was targeted with verbal and physical harassment that

consisted of some of the most hate-filled, anti-Semitic slurs imaginable.  During this time period, students at Northport High routinely hurled anti-Semitic insults at G.D.S., including "Jews are disgusting," "You dumb Jew," "Being Jewish must suck," "Hitler was a good person," "My love for you burns like a thousand Jews in an oven."  Students at Northport High would address G.D.S. as "Jew" and get his attention by saying "Hey, Jew."  Northport High students would also drop coins in front of G.D.S. and say "Get them, Jew," or "Pick it up, Jew."  Finally, Northport High students would tell horrifically anti-Semitic jokes in G.D.S.'s presence, such as "How many Jews can fit into a car? Two in the front, three in the back, and six million in the ash tray," and "What's the difference between a Jew and a pizza? A pizza doesn't scream when it goes into the oven."  This is just a small sampling of the outrageous verbal abuse G.D.S. routinely experienced as a student at Northport.

2.     Far from isolated incidents perpetrated by one or two individuals at Northport High, the abuse G.D.S. endured came at the hands of approximately 15-20 different students, with the most outrageous harassment perpetrated by a group of approximately ten individuals.

3.     G.D.S. and his parents did not remain quiet in the face of this abuse.  As early as May 2011, G.D.S. and his parents began voicing their concerns to Northport High officials, and did so repeatedly through the summer of 2011.  Despite this repeated notice of the abuse endured by G.D.S., Defendants did virtually nothing to ensure that G.D.S. was educated without fearing for his own personal safety and enduring daily humiliation and harassment.  Indeed, Defendants have not followed their own procedures for handling and investigating complaints, and for disciplining students involved in the harassment.

4.    As a result, G.D.S.'s parents withdrew him from Northport at the end of the 2010-2011 school year and enrolled him in a private school.  Because of Defendants' failure to appropriately address the abuse directed at G.D.S., that abuse only worsened after he and his parents complained to the school, and it reached a fever pitch towards the end of the school year. Ultimately, G.D.S. had no choice but to withdraw from school to avoid the emotional suffering he was experiencing at the hands of the school bullies.

5.    Accordingly, Plaintiff seeks a declaratory judgment, and compensatory and punitive damages to remedy violations of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983; Section 296 of the New York Human Rights Law; and Sections 40-c and 40-d of the New York Civil Rights Law.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.  This Court has supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as the federal claims.

7.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the events that give rise to Plaintiff's claims took place in the Eastern District of New York.

## PARTIES

8.    Plaintiff G.D.S. is a 16-year-old resident of Suffolk County and a citizen of the State of New York.  He was a student in the Northport-East Northport Union Free School District from September 2002 through June 2011.  G.D.S. was a student at Northport High School from September 2010 to June 2011.

- 3 -

9.      Defendant Northport-East Northport Union Free School District (the "School District") is an education corporation and association in Suffolk County, New York, existing pursuant to New York Education Law.  The School District is a "person" within the meaning of 42 U.S.C. § 1983.  Upon information and belief, the School District and each of its component schools are recipients of federal financial assistance.  The School District is non-sectarian and exempt from taxation pursuant to § 408 of New York's real property tax law. Northport is a high school in the School District.

10.     Defendant Dr. Marylou McDermott, sued in both her official and individual capacities, is the current Superintendent of the School District.  Dr. McDermott has been the Superintendent of the School District at all times that G.D.S. was a student there.

11.     Defendant Irene McLaughlin, sued in both her official and individual capacities, is the current principal of Northport High.  Principal McLaughlin has held that position at all times that G.D.S. has been a student at the school.

## STATEMENT OF FACTS

## G.D.S. Has Experienced Severe, Pervasive, and Violent Harassment at School Based on his Religion

12.     From late 2010 to June 2011, G.D.S.'s classmates at Northport High bullied him and harassed him because of his religion.

13.     Starting in December 2010, certain students at Northport High began to make overtly anti-Semitic comments and jokes to G.D.S.  The comments increased in severity, both in terms of their substance and their frequency, through June 2011.

- 4 -

14. Initially, certain individuals at Northport High started to refer to G.D.S. regularly as "Jew" or to call to him by saying "Hey, Jew."

15. On Valentine's Day of 2011, one of the students approached G.D.S. in the cafeteria at Northport High in the hearing of other students and told G.D.S. that he had a poem he wanted to read to him. The student proceeded to read, in sum and substance: "Roses are red, violets are blue. My love for you is burning hotter than 100 Jews burning in the oven."

16. In addition to abusing G.D.S. with their anti-Semitic slurs in person at Northport High, some of G.D.S's tormenters also published their hate-filled speech on their Facebook pages, where it was available for G.D.S. and other classmates from Northport to see.

17. For example, on January 4, 2011, one of the Northport students who routinely bullied G.D.S. at school with anti-Semitic slurs wrote the following in a "wall-to-wall" Facebook conversation with another Northport High student who also routinely bullied G.D.S.: "truth is you are hilarious! are many nazi convos make my life…"[1]

18. As evidence of the negative affect the harassment at school was having on G.D.S. as early as January 2011, he wrote an essay for his English class dated January 7, 2011. The essay was titled "Anti-Semitism."

19. In the essay, G.D.S. stated that he loves being Jewish, but that it "gets lonely in school." G.D.S. went on to explain that when he was walking down the hallway at school, he would hear someone say "hey Jew," or when he would sneeze, he would hear someone say "God bless Jew."

20. G.D.S. recounted in the essay that someone had said to his face "What's the difference between a Jew and a pizza? A pizza doesn't scream when it goes in the oven."

---

[1] Most of the statements from Facebook recited herein are riddled with typographical and grammatical

G.D.S. recalled not knowing what to do in response and standing there in total shock after this comment.

21.     After relaying another specific incident in which he was the subject of an anti-Semitic slur, G.D.S. ended the essay by saying "Anti-Semitism does exsist [sic] in Northport, [and] I'm a Key victim."

22.     Despite the fact that G.D.S.'s teacher had clearly read and edited the essay, G.D.S. and his parents were never contacted about its contents, and upon information and belief, neither the teacher nor the administration of Northport High took any action with regard to the contents of the essay.

23.     In February 2011, as the in-school harassment of G.D.S. continued and increased, his tormenters also continued their vitriolic, anti-Semitic rants on Facebook.  In a February 23, 2011 "wall to wall" conversation on Facebook between the same two Northport High students, one wrote to the other "saw this and thought of you," followed by a smiley emoticon.  Directly below this statement was a picture of Anne Frank.  Above the likeness were the words "Just gonna stand there and watch me burn," and below the likeness were the words "That's alright because I like the way it hurts."

24.     The commentary by "friends" of the original poster was equally shocking.  One responded simply with "HAHAHAHAHAHAHAHAHAHA...." repeated many times in all capital letters.  The original poster then responded with "HAHAHAHAH IM SORRY. ITS SOOO FUNNY. i had too."

25.     Also on February 23, 2011, the original poster posted another picture of Anne Frank on Facebook with the caption "I don't answer knock-knock jokes."  In the comments

errors, but are being reproduced herein exactly as they appeared on Facebook.

- 6 -

to the post on the same day and for two days thereafter, the students from Northport High who bullied G.D.S. commented on the picture. The original poster said "oh my gosh! i am laughing so hard im about to fall in the gas chambers." In response, another of the Northport High students that bullied G.D.S. stated "don't worry! The piles of shoes will catch you!" The original poster then said "hopefully they don't smell so strongly of gas from the chamber." Yet another commenter from Northport High said "BRB [be right back] somones at the door ;)," to which the original poster responded "Brb shower :]."

26.    Also on February 23, 2011, one of the Northport High students who was bullying G.D.S. at school posted yet another picture of Anne Frank. The caption above the picture read "Knock Knock" "Whose There?" The caption below the picture read "O God Dammit." The student who posted the picture wrote above the picture "FOOLED AGAIN." In response, one of the other students who bullied G.D.S. at Northport High said "this is the funniest one ive ever seen hahaha."

27.    Less than a month later, on March 14, 2011, the same Northport High student posted a YouTube video to Facebook in a "wall-to-wall" posting to another Northport High student who had been involved in the February postings. The video was titled "Top 60 Jewish Ghetto Names."

28.    On May 23, 2011, after G.D.S.'s parents became aware of the extent of the harassment G.D.S. was enduring at school, they initiated a meeting with the Superintendent McDermott and Principal McLaughlin. G.D.S. was present for the meeting as well. G.D.S.'s parents initiated the meeting with school officials in hopes that the officials would take steps to specifically protect G.D.S. from the harassment and to also educate the entire student body about the dangers of harassment and bullying.

29.     In the meeting, G.D.S. and his parents presented a list of the anti-Semitic jokes that were being directed at G.D.S. and also presented the Facebook messages recounted above to school officials.  Upon information and belief, the School District failed to take investigative and/or remedial measures in order to specifically ensure that G.D.S. enjoyed the benefits of an "educational setting" free of all forms of harassment, violence and bullying.

30.     During the course of the meeting, Dr. McDermott and Ms. McLaughlin did state that, by the end of the school year, the Principal would deliver a message regarding tolerance and instruct Social Studies teachers to discuss the issue in class.  Upon information and belief, this never occurred.

31.     Dr. McDermott and Ms. McLaughlin also stated that at the start of the 2011 school year, the school would conduct a "Tolerance Week" and would take steps through curriculum changes to ensure that a culture of religious tolerance would be encouraged at the school.  Upon information and belief, the measures they offered to take were not taken at all or were taken only in part.

32.     Approximately two weeks later, Ms. McLaughlin and a school social worker met with G.D.S. to see how he was doing.  In the meeting, Ms. McLaughlin told G.D.S. that he should consider what the bullies were going through at home, but offered no further assistance to G.D.S. for combatting the bullying.

33.     Aside from this single follow-up meeting with G.D.S., school officials never contacted G.D.S. or his parents again regarding the harassment.

34.     In the absence of any action by the school to address the harassment, it only got worse as the school year wound to a close.

35.     During the week of June 6, 2011, one of the students who routinely harassed G.D.S. dropped a backpack from a balcony overlooking the hall G.D.S. was walking in. Two of G.D.S.'s harassers then ran up to him, held his arms and feet, and shook him, saying that they wanted him to give them money.

36.     The incident was witnessed by a Northport High teacher, who said in sum and substance "Boys, I can get you in trouble for doing this," but then walked away and did nothing. G.D.S. approached the teacher the next day about the incident, and the teacher informed G.D.S. that she would report it to the Assistant Principal. No one from the school administration ever contacted G.D.S. or his parents about the incident and, upon information and belief, no action was ever taken to address the incident.

37.     Also in June 2011 when the students were asked to resubmit a narrative of their choice that they had written during the year, G.D.S. resubmitted the "Anti-Semitism" essay that he had first submitted in January 2011 to his English teacher, as referenced above in Paragraphs 18-22, providing yet another notification to the school of the negative impact the discriminatory treatment was having on G.D.S.

38.     In addition, G.D.S.'s mother spoke with the school's social worker in June 2011 about anti-Semitic remarks that had been made to G.D.S. at track practice. The social worker asked if she could report this to Ms. McLaughlin, the school's principal, and G.D.S.'s mother agreed. According to the social worker, she spoke to Ms. McLaughlin specifically about the anti-Semitic slurs at track practice. No one from the school administration ever contacted G.D.S. or his parents about the anti-Semitic slurs at track practice and, upon information and belief, no action was ever taken to address the slurs.

39.     The anti-Semitic rants by G.D.S.'s harassers continued unchecked on Facebook in June 2011 as well.  The same two students from Northport High responsible for the February and March anti-Semitic Facebook postings posted the following on Facebook on June 17, 2011:  "truth is HAI [student]…we had the best spanish in the world. we freaked out the beautiful Kaswamt Brar but he knows he loves us…we found out where seniorita is and I yelled at you everyclass which was histerical! anyways we need to hang out this summer. its necessary or i will burn you.  oh and swastika dance."

40.     In an August 2011 Facebook post between the same two Northport High students, one said to the other "you always brightened my day in Spanish you motherfuckin nazi," and ended the post with "heil hitler."

41.     As recently as March 2012, one of the Northport High students involved in harassing G.D.S. received a Facebook wall post from another Northport High student which had a picture of the singer Adele with her face made to look like Adolf Hitler and the caption "Adelef Hitler."  The person who initiated the wall post stated "nevermind I'll find and kill all the jewssss."

42.     Finally, during the summer of 2011, the names of the individual students who had been harassing G.D.S. for nearly the entire school year were provided to School District officials.  Upon information and belief, Defendants have done nothing to address the harassment or to reprimand the perpetrators to date, notwithstanding the fact that they have been provided with detailed information about the nature of the harassment and about the students who engaged in the discriminatory and bullying behavior.

43.     As a result of the severe and pervasive harassment that G.D.S. suffered and as a result of Defendants' deliberate indifference, G.D.S. decided not to return to Northport High for his sophomore year.

### G.D.S. Has Suffered Physically, Emotionally, and Academically as a Result of this Pattern of Severe and Pervasive Harassment

44.     Rather than being able to view attending school as a pleasant and safe educational opportunity, G.D.S. came to dread each day in school because of the constant humiliation and fear he experienced as a result of the pattern of severe and pervasive religious harassment alleged above.

45.     This pattern of harassment has impaired G.D.S.'s ability to obtain educational benefits and advancement.  G.D.S. went from being a happy, outgoing, well-adjusted child to being depressed and introverted because of the Defendants' failure to address the escalating harassment.

46.     G.D.S. has been forced to attend a private school rather than the public school which it is his right to attend because of the harassment and Defendants' failure to address the harassment.  As a result, G.D.S.'s family is now forced to pay private school tuition that they would not have otherwise chosen to pay.

47.     G.D.S. has suffered and continued to suffer emotional distress and humiliation because of the harassment he has been forced to endure.

48.     Defendants' unlawful and discriminatory acts and omissions were the direct and proximate cause of the harms alleged herein.

<u>Defendants Have Been Deliberately Indifferent to the Pattern of Severe and Pervasive
Harassment Suffered by G.D.S.</u>

49.     Defendants failed to undertake any meaningful investigative, disciplinary,

preventative, remedial or corrective measures in response to this pattern of religious harassment

against G.D.S., despite the ability and authority to do so on behalf of the School District. This

failure to act despite actual knowledge that G.D.S. was being harassed departed from the

District's own established procedures for dealing with harassment and discrimination.

50.     Principal McLaughlin and Superintendent McDermott, along with at least

two teachers at Northport and the social worker, had actual knowledge that G.D.S. was suffering

from severe and pervasive harassment because of his religion. G.D.S. and his parents met with

school officials to make them aware of the harassment, G.D.S. wrote an essay detailing some of

the harassment that he submitted to his English teacher, and G.D.S.'s parents had several

conversations with Northport's social worker.

51.     Upon information and belief, Principal McLaughlin did not take any

meaningful or effective steps to address the severe and pervasive religion-based harassment

G.D.S. experienced at Northport High.

52.     Principal McLaughlin currently has --- and had at all relevant times while

G.D.S. was a student at Northport High --- final policymaking authority for the School District

with respect to day-to-day enforcement of equal opportunity, anti-harassment, and anti-bullying

policies at Northport High School, including the school's code of conduct. This includes the

responsibility to redress complaints of discrimination and harassment, discipline perpetrators,

and forward complaints to appropriately designated individuals in the School District.

53.     Upon information and belief, Superintendent McDermott did not take any meaningful or effective steps to address the severe and pervasive religion-based harassment G.D.S. experienced at Northport High.

54.     Upon information and belief, Superintendent McDermott is responsible for promoting a safe, orderly and stimulating school environment and for reviewing with district administrators the policies of the Board of Education and state and federal laws relating to school operations and management.  Superintendent McDermott has the authority to work with district administrators in enforcing the code of conduct and assuring that all claims of harassment are resolved promptly and fairly.  Superintendent McDermott is also responsible for creating instructional programs that decrease instances of misconduct and are sensitive to student and teacher needs.

55.     Upon information and belief, Superintendent McDermott had the ability and authority to take corrective action on behalf of the School District to stop the discrimination and harassment of G.D.S., to discipline the perpetrators of such discrimination and harassment and to forward his complaints of harassment to the appropriately designated individuals.

56.     Despite repeated complaints to District Officials about the harassment G.D.S. was experiencing, neither G.D.S. or his parents were ever informed of any anti-harassment policy or grievance procedure that was available to them.

57.     Upon information and belief, Defendants did not take appropriate steps under the School District's anti-harassment policy and under the Northport High Code of Conduct to address the harassment that G.D.S. experienced.

- 13 -

58.     The Northport-East Northport Union Free School District Board of Education Policy includes provisions that prohibit the type of bully experienced by G.D.S. and that prescribe remedies when such bullying takes place.

59.     Specifically, the Board Policy states in Section 5020.4, titled *Hazing, Harassment and Bullying of Students*, that "[t]he Board of Education is committed to having students feel safe at school – safe from violence, safe from humiliation, and safe from bullying." The Policy goes on to state that the Board is committed to an environment that is free from all forms of harassment, including "Verbal abuse by students against student consisting of threats, insults against family and any foul language"; "Purposely bumping, pushing, tripping, shoving another student"; "Sexual, racial, religious or ethnic graffiti on desks, walls and in written notes;" and "Cyber bullying, including the use of e-mail and instant messaging by an individual or group intended to harm others."

60.     In order to remedy such problems, the Policy directs that the Superintendent of Schools "shall research and implement curriculum activities which will raise awareness of the issues surrounding all forms of harassment."

61.     Board of Education Policy 5300, titled *Public Conduct on School Property*, states that the district is "committed to providing an orderly, respectful environment that is conducive to learning."  In its list of prohibited conduct, the Policy states that "No person, either alone or with others, shall: (5) Intimidate, harass or discriminate against any person on the basis of race, color, creed, national origin, religion, age, gender, sexual orientation or disability."

62.     The Policy states that students who participate in this prohibited conduct "shall be subject to disciplinary action as the facts may warrant, in accordance with the due

process requirements." The Policy provides that the "district *shall* initiate disciplinary action

against any student or staff member, as appropriate, with the "Penalties" section above."

63.     Upon information and belief, Superintendent McDermott and Principal

McLaughlin had the ability and authority to take corrective action on behalf of the School

District to stop the discrimination and harassment of G.D.S. and to discipline the perpetrators of

such discrimination and harassment.

64.     Despite repeatedly asking Defendants for a response to his complaint,

neither G.D.S. nor his family was ever informed whether any investigation was undertaken, the

results of any such investigation, or whether any remedial action was taken.  Upon information

and belief, neither Superintendent McDermott nor Principal McLaughlin ever initiated an

investigation into the harassment of G.D.S. about which they had been made aware and never

investigated the allegations themselves.  Upon information and belief, neither Superintendent

McDermott nor Principal McLaughlin ever initiated any other form of corrective action to

address the discrimination and harassment suffered by G.D.S.

65.     Upon information and belief, the acts and omissions of discrimination and

harassment committed by School District employees alleged herein reflected, and were made

pursuant to, policies and practices of the School District.  These acts and omissions were

sufficiently persistent so as to constitute a custom of the School District with the force of and

were so manifest to imply the acquiescence of senior policy-making officials.

66.     Upon information and belief, neither the School District nor any of the

School District's officials, policy makers, administrators, or other employees provided, at any

time relevant to this Complaint, appropriate training to administrators, faculty, or staff with

respect to discrimination, harassment, or bullying based on religion.  This failure occurred

despite actual knowledge by relevant policy makes, officials, administrators, and employees of

the prevalence of anti-Semitic discrimination and harassment by School District students.  The

failure to provide training is a direct and proximate cause of the School District's employees'

discrimination against and harassment of G.D.S. and their failure to adequately address the

harassment against him perpetrated by others.

      67.    At all relevant times all Defendants were acting under color of state law.

At all relevant time, the Defendants who are employees of the School District were acting within

the scope of their employment.

## AS AND FOR A FIRST CAUSE OF ACTION
U.S. Constitution Amendment XIV-Denial of Equal Protection on the Basis of Religion
(Brought by G.D.S. Pursuant to 42 U.S.C. § 1983 Against the School District, Superintendent
McDermott, and Principal McLaughlin, in their official and individual capacities)

      1.    The acts and omissions of the Defendants, described above, violated

G.D.S.'s clearly established rights under the Equal Protection Clause of the Fourteenth

Amendment to the United States Constitution.

## AS AND FOR A SECOND CAUSE OF ACTION
New York State Constitution Article One Section 11-Denial of Equal Protection on the Basis of
Religion
(Brought by G.D.S. Against the School District, Superintendent McDermott, and Principal
McLaughlin, in their official and individual capacities)

      2.    The Acts and omissions of the Defendants, described above, violated

G.D.S.'s clearly established rights under Article One Section 11 of the Constitution of the State

of New York, which provides that no person shall be denied the equal protection of the laws of

this state and that no person shall because of religion be subject to any discrimination in his or

her civil rights by the state or any agency or subdivision of the state because of religion.

- 16 -

## AS AND FOR A THIRD CAUSE OF ACTION
New York State Human Rights Law, New York Executive Law § 296(6)
(Brought by G.D.S. Pursuant to the New York Human Rights Law Against Superintendent
McDermott, and Principal McLaughlin)

3.      The acts and omissions of the individual Defendants, described above,

aided, abetted, incited, compelled and/or coerced the harassment of G.D.S. on the basis of his

religion, in violation of New York Human Rights Law § 296(6) .

## AS AND FOR A FOURTH CAUSE OF ACTION
New York Civil Rights Law §§ 40-c and 40-d
Discrimination on the Basis of Religion
(Brought by G.D.S. Pursuant to the New York Civil Rights Law Against the School District,
Superintendent McDermott, and Principal McLaughlin, in their individual capacities)

4.      The acts and omissions of the Defendants, described above, subjected

G.D.S. to discrimination on the basis of his religion in violation of New York Civil Rights Law §

40-c.

5.      The acts and omissions of the individual Defendants, described above,

aided and incited unlawful discrimination by others against G.D.S. on the basis of his religion in

violation of the New York Civil Rights Law § 40-d.

6.      Plaintiffs have complied with the requirements of New York Civil Rights

Law § 40-d by serving notice upon the state attorney general.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues pursuant to the Seventh Amendment to the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure.

## RELIEF SOUGHT

WHEREFORE, Plaintiff G.D.S. requests judgment in his favor against the Defendant as follows:

(a)   A declaration that the Defendants violated G.D.S.'s legal rights;

(b)   A permanent injunction requiring the Northport-East Northport Union Free School District to take appropriate steps to remedy the deprivation of G.D.S.'s rights;

(c)   Compensatory damages against Defendants for violations of the Fourteenth Amendment to the U.S. Constitution;

(d)   Compensatory damages against Defendants for violations of Article One Section 11 of the New York State Constitution;

(e)   Compensatory damages against Defendants for violations of the New York Human Rights Law;

(f)   Compensatory damages against Defendants for violations of the New York Civil Rights Law;

(g)   Punitive damages against Defendants for violations of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution

(h)   Attorney's fees and costs incurred in the prosecution of this action pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

(i)    Any other relief that the Court may deem just and proper.

Dated:    New York, New York
          May 2, 2012

MOSKOWITZ & BOOK, LLP

By:_____

Chaim B. Book (CB 4652)
M. Todd Parker (MP 4548)
Attorneys for Plaintiff
345 Seventh Avenue, 21st Floor
New York, New York 10001
(212) 221-7999