**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
G.D.S., a minor child, by his father and natural
guardian, Robert Slade,

|  |  |
|---|---|
| Plaintiff, | **MEMORANDUM OF** |
| | **DECISION AND ORDER** |
| -against- | 12-CV-2191 (ADS)(GRB) |

NORTHPORT-EAST NORTHPORT UNION
FREE SCHOOL DISTRICT, DR. MARYLOU
MCDERMOTT, Superintendent of Northport-
East Northport Union Free School District, and
IRENE MCLAUGHLIN, Principal of Northport
High School,

                      Defendants.
--------------------------------------------------------X

<u>**APPEARANCES:**</u>

**Moskowitz & Book**
*Attorneys for the plaintiff*
345 Seventh Avenue
21st Floor
New York, NY 10001
    By:  Chaim B. Book, Esq.
           Michael Todd Parker, Esq., Of Counsel

**Sokoloff Stern LLP**
*Attorneys for the defendants*
179 Westbury Avenue
Carle Place, NY 11514
    By:  Adam I. Kleinberg, Esq.,
           Anthony F. Cardoso, Esq., Of Counsel

**SPATT, District Judge**.

      On May 3, 2012, the plaintiff G.D.S., a minor child, by his father and natural guardian

Robert Slade ("the Plaintiff"), commenced this 42 U.S.C. § 1983 action by filing a Complaint

against the defendants Northport-East Northport Union Free School District ("Northport School

District"); Dr. MaryLou McDermott, Superintendent of Northport School District

("McDermott"); and Irene McLaughlin, Principal of Northport High School ("McLaughlin" and collectively "the Defendants").  The Plaintiff seeks a declaratory judgment, a permanent injunction, compensatory damages, punitive damages and attorney's fees and costs for the Defendants' alleged violation of his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  The Plaintiff further alleges that the Defendants violated his rights under Article One, Section 11 of the Constitution of the State of New York, the New York State Human Rights Law ("NYSHRL"); and the New York Civil Rights Law ("NYCRL") §§ 40-c and 40-d.

Presently before the Court is a motion by the Defendants to dismiss the Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6).  For the reasons set forth below, the motion is denied in part and granted in part.

## I.  BACKGROUND

The following facts are derived from the Plaintiff's Complaint, filed on May 3, 2012.  In the resolution of this motion, the facts are construed in the light most favorable to the Plaintiff.

The Plaintiff is currently a 16-year-old resident of Suffolk County and a New York State citizen.  From September 2002 until June 2011, he was a student in the Northport School District, and from September 2010 to June 2011, he attended Northport High School.  The Northport School District is an education corporation in Suffolk County, New York, and exists pursuant to New York Education Law.  The Northport School District receives federal financial assistance and is non-sectarian and exempt from taxation under § 408 of New York State's real property tax law.  Northport High School is a school within the Northport School District.  At all relevant times, McDermott was the Superintendent of the Northport School District and McLaughlin was the principal of Northport High School.

Starting in about November or December 2010, the Plaintiff became the target of bullying and harassment from other students at Northport High School due to his religion, which is Judaism.  In this regard, about 15 to 20 Northport High School students began to make overtly anti-Semitic comments and jokes to the Plaintiff.  At first, the Plaintiff's classmates would regularly call the Plaintiff "Jew" or call to him by saying "Hey, Jew."  (Pl. Compl., ¶ 14.)  However, the insults and jokes grew worse in severity during the school year and included "Jews are disgusting," "You dumb Jew," "Being Jewish must suck," "Hitler was a good person," "My love for you burns like a thousand Jews in an oven," "How many Jews can fit into a car?  Two in the front, three in the back, and six million in the ash tray," and "What's the difference between a Jew and a pizza?  A pizza doesn't scream when it goes into the oven."  (Pl. Compl., ¶¶ 1, 13.)  In addition, on Valentine's Day 2011, a student approached the Plaintiff in the Northport High School cafeteria and read the following poem "Roses are red, violets are blue.  My love for you is burning hotter than 100 Jews burning in the oven."  (Pl. Compl, ¶ 15.)  The Plaintiff's classmates would also drop coins in front of the Plaintiff and say "Get them, Jew," or "Pick it up, Jew."  (Pl. Compl., ¶ 1.)

The students who were harassing the Plaintiff also shared anti-Semitic slurs online through the social networking website Facebook.  It appears that these anti-Semitic slurs were not directed at the Plaintiff, but were available to the Plaintiff and his classmates to see.  For example, on January 4, 2011, one of the students who regularly bullied the Plaintiff with anti-Semitic slurs posted in a "wall-to-wall" Facebook conversation with another Northport High School student that "many nazi convos make my life."  (Pl. Compl., ¶ 17.)

On February 23, 2011, these same two students, in another wall-to-wall conversation, shared a picture of Anne Frank with the words "Just gonna stand there and watch me burn" and

3

"That's alright because I like the way it hurts." (Pl. Compl., ¶ 23.)  The responses to this picture included "HAHAHAHAHAHAHA" repeated many times in all capital letters.  (Pl. Compl., ¶ 24.)  The original poster of the picture wrote back "HAHAHAHAH IM SORRY, ITS SOOO FUNNY. i had to." (Pl. Compl., ¶ 24.)

Also on February 23, 2011, these same students shared a second picture of Anne Frank on Facebook with the caption "I don't answer knock-knock jokes."  (Pl. Compl., ¶ 25.)  In the comments for this second picture, the two students, as well as other students from Northport High School, wrote "oh my gosh!  I am laughing so hard im about to fall in the gas chambers," "don't worry!  The piles of shoes will catch you," "hopefully they don't smell so strongly of gas from the chamber," "BRB [be right back] somones at the door ;)" and "Brb shower :]." (Pl. Compl., ¶ 25.)

Another Northport High School student shared a third picture of Anne Frank on Facebook on February 23, 2011.  The caption on the picture read "Knock Knock, Whose There? O God Dammit."  The student posting the picture wrote "FOOLED AGAIN."  (Pl. Compl., ¶ 26.)  In response, one of the other students who regularly harassed the Plaintiff wrote "this is the funniest one I've ever seen hahaha."  (Pl. Compl., ¶ 26.)  A few weeks later, on March 14, 2011, the same student who shared the third picture of Anne Frank posted a YouTube video entitled "Top 60 Jewish Ghetto Names" on the Facebook wall of another student who had been involved in the February 2011 anti-Semitic Facebook postings mentioned above.  (Pl. Compl., ¶ 27.)

On or about January 7, 2011, the Plaintiff wrote an essay for his English Class entitled "Anti-Semitism."  In the essay, the Plaintiff stated that while he loves being Jewish, it "gets lonely in school" and he recounted specific incidents in which he was the subject of an anti-Semitic slur (Pl. Compl., ¶ 19.)  He explained that when he walked down the hallway at school,

4

classmates would say "hey Jew," or when he sneezed, classmates would say "God bless Jew."
(Pl. Compl., ¶ 19.)  In addition, the Plaintiff recounted that another student said to his face
"What's the difference between a Jew and a pizza?  A pizza doesn't scream when it goes in the
oven."  (Pl. Compl., ¶ 20.)  The Plaintiff did not know how to respond to this insult and just
stood there in total shock.  The Plaintiff concluded his essay by saying "Anti-Semitism does exist
[sic] in Northport, [and] I'm a Key victim."  (Pl. Compl., ¶ 20.)  Although the Plaintiff's teacher
read and edited this essay, it appears that the Plaintiff and his parents were never contacted about
its contents and neither the teacher nor the administration of Northport High School took any
action with regard to the contents of the essay.

On May 23, 2011, after the Plaintiff's parents became aware of the extent of the
harassment the Plaintiff was enduring at school, they initiated a meeting with McDermott and
McLaughlin.  The Plaintiff was also present at this meeting.  The Plaintiff's parents' goal in
initiating this meeting was to get officials to take steps to protect the Plaintiff from harassing and
to educate the entire student body about the dangers of harassment and bullying.  At the meeting,
the Plaintiff and his parents provided McDermott and McLaughlin with a list of the anti-Semitic
slurs that were being directed at the Plaintiff, as well as the anti-Semitic Facebook messages
mentioned above.

However, according to the Plaintiff, the Northport "School District failed to take
investigative and/or remedial measures in order to specifically ensure that [the Plaintiff] enjoyed
the benefits of an 'educational setting' free of all forms of harassment, violence and bullying."
(Pl. Compl., ¶ 29.)  In this regard, McDermott and McLaughlin told the Plaintiff and his parents
at the May 23, 2011 meeting that McLaughlin would deliver a message regarding tolerance and
instruct Social Studies teachers to discuss the issue in class by the end of the school year.

Further, McDermott and McLaughlin told them that the school would conduct a "Tolerance Week" at the start of the 2011 school and that they would take steps through curriculum changes to ensure that a culture of religious tolerance would be encouraged at Northport High School. Yet, it appears that these offered measures were not done.

Two weeks after the May 23, 2011 meeting, the Plaintiff met with McLaughlin and a Northport High School social worker.  During this meeting, "McLaughlin told [the Plaintiff] that he should consider what the bullies were going through at home, but offered no further assistance to the Plaintiff for combatting the bullying."  (Pl. Compl., ¶ 32.)  Besides this single follow up meeting, neither the Plaintiff nor his parents were contacted again regarding the harassment.

The harassment of the Plaintiff continued after the May 23, 2011 meeting.  For example, during the week of June 6, 2011, one of the students who frequently bullied the Plaintiff dropped a backpack overlooking the hall that the Plaintiff was walking in.  Then, two other students ran up to the Plaintiff, held his arms and feet and shook him, saying they wanted him to give them money.  A Northport High School teacher witnessed this incident and stated "Boys, I can get you in trouble for doing this," but then walked away without doing anything.  (Pl. Compl., ¶ 36.) The next day, the Plaintiff asked the teacher about the incident, and the teacher told the Plaintiff she would report it to the Assistant Principal.  However, no one from the school administration ever contacted the Plaintiff or his parents about the incident and it appears no action was ever taken to address the bullying.

In June 2011, the Plaintiff resubmitted his "Anti-Semitism" essay from January 2011, thereby once again notifying Northport High School of the religious based harassment he was facing.  Also in June 2011, the Plaintiff's mother spoke with the school's social worker about anti-Semitic remarks that had been made to the Plaintiff at track practice.  Although the social

worker spoke to McLaughlin about these anti-Semitic remarks, it appears no action was ever

taken to address the slurs.

      ThePleas anti-Semtic diatribes continued on Facebook.  On June 17, 2011, the Northport

High School students involved in the February and March anti-Semitic Facebook postings posted

"anyways we need to hang out this summer.  its necessary or i will burn you.  oh and swastika

dance."  (Pl. Compl., ¶ 39.)  In August 2011, one of these students wrote to another student on

Facebook that "you always brightened my day in Spanish you motherfuckin nazi" and ended the

post with "heil hitler."  (Pl. Compl., ¶ 40.)

      In the summer of 2011, the Northport School District officials received the names of the

individual students who had been harassing the Plaintiff during the 2010-2011 academic year.

However, it appears that "the Defendants have done nothing to address the harassment or to

reprimand the perpetrators to date, notwithstanding the fact that they have been provided with

detailed information about the nature of the harassment and about the students who engaged in

the discriminatory and bullying behavior."  (Pl. Compl., ¶ 42.)  Consequently, due to the anti-

Semitic harassment and the Defendants' "deliberate indifference," the Plaintiff decided not to

return to Northport High School.  (Pl. Compl., ¶ 43.)

## II.  DISCUSSION

### A.  Legal Standard under Fed. R. Civ. P. 12(b)(6)

      It is well-established that a complaint should be dismissed under Fed. R. Civ. P. 12(b)(6)

only if it does not contain enough allegations of fact to state a claim for relief that is "plausible

on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed.

2d 929 (2007).  In deciding whether a complaint meets this threshold, the Court is required to

accept the material facts alleged in the complaint as true and draw all reasonable inferences in

the Plaintiff's favor.  <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949-50, 173 L. Ed. 2d 868 (2009).

Only if this Court is satisfied that the Complaint cannot state any set of facts that would entitle

the Plaintiff to relief will it grant dismissal pursuant to Rule 12(b)(6).  <u>Hertz Corp. V. City of</u>

<u>New York</u>, 1 F.3d 121, 125 (2d Cir. 1993).

**B.  As to Whether the Plaintiff's First Cause of Action Should Be Dismissed**

  The Plaintiff's first cause of action asserts a 42 U.S.C. § 1983 claim against the

Defendants.  It alleges that the acts and omissions of the Defendants violated the Plaintiff's

clearly established rights under the Equal Protection Clause of the Fourteenth Amendment to the

United States Constitution.  The Defendants contend that this cause of action should be

dismissed on the grounds that (1) the Plaintiff's Equal Protection claim is barred by the doctrine

of primary jurisdiction and (2) the Plaintiff cannot sustain an Equal Protection claim.  For the

reasons that follow, the Court disagrees with the Defendants contentions and thus, denies their

motion to dismiss the Plaintiff's first cause of action.

  **1.  The Doctrine of Primary Jurisdiction Does Not Apply in This Case**

  The doctrine of primary jurisdiction is a "discretionary doctrine," which "is used to fix

forum priority when the courts and an administrative agency have concurrent jurisdiction over an

issue." <u>Mrs. W. v. Tirozzi</u>, 832 F.2d 748, 758-759 (2d Cir. 1987) (citing <u>Far E. Conference v.</u>

<u>United States</u>, 342 U.S. 570, 574-75, 96 L. Ed. 576, 72 S. Ct. 492 (1952)).  The aim of this

doctrine is to "promot[e] proper relationships between the courts and administrative agencies

charged with particular regulatory duties" and "to allocate initial decisionmaking responsibility

between courts and agencies" so as "to ensure that they do not work at cross-purposes."  <u>Ellis v.</u>

<u>Tribune TV Co.</u>, 443 F.3d 71, 81 (2d Cir. 2006) (citations and internal quotation marks omitted).

While "[n]o fixed formula has been established" with respect to the doctrine's application, Nat'l Communs. Ass'n v. AT&T, 46 F.3d 220, 223 (2d Cir. 1995), the doctrine of primary jurisdiction "potentially applies when federal courts have original jurisdiction to hear the claim and the claim requires the resolution of issues placed within the special competence of an administrative body," Mrs. W., 832 F.2d at 758 (2d Cir. 1987) (citing United States v. Western Pac. Ry. Co., 352 U.S. 59, 63-64, 1 L. Ed. 2d 126, 77 S. Ct. 161 (1956)).  In this regard, courts generally consider the following four factors when determining whether the doctrine applies:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;
> (2) whether the question at issue is particularly within the agency's discretion;
> (3) whether there exists a substantial danger of inconsistent rulings; and
> (4) whether a prior application to the agency has been made[.]

Schiller v. Tower Semiconductor, Ltd., 449 F.3d 286, 295 (2d Cir. 2006).  However, "courts seldom defer to an administrative agency when the issue involved is purely a legal question not involving either administrative experience or expertise."  Mrs. W., 832 F.2d at 759.

In this case, the Defendants argue that under New York Education Law § 310, the New York State Commissioner of Education ("the Commissioner") should have been afforded the opportunity to resolve the Equal Protection issues raised by the Plaintiff, since they relate both to the disciplinary consequences imposed for student harassment and to the broad policies and procedures of the Northport School District.  Under § 310, an aggrieved party may appeal to the Commissioner for any action made:

> 1. By any school district meeting.
> 2. By any district superintendent and other officers, in forming or altering, or refusing to form or alter, any school district,

or in refusing to apportion any school moneys to any such district or part of a district.

3. By a county treasurer or other distributing agent in refusing to pay any such moneys to any such district.

4. By the trustees of any district in paying or refusing to pay any teacher, or in refusing to admit any scholar gratuitously into any school or on any other matter upon which they may or do officially act.

5. By any trustees of any school library concerning such library, or the books therein, or the use of such books.

6. By any district meeting in relation to the library or any other matter pertaining to the affairs of the district.

6-a. By a principal, teacher, owner or other person in charge of any school in denying a child admission to, or continued attendance at, such school for lack of proof of required immunizations in accordance with section twenty-one hundred sixty-four of the public health law.

7. By any other official act or decision of any officer, school authorities, or meetings concerning any other matter under this chapter, or any other act pertaining to common schools.

Pursuant to this authority, it appears that the Commissioner has addressed and resolved constitutional questions.  See, e.g., Appeal of Elizabeth and David Passer, 44 Ed. Dept. Rep., Decision No. 15,164 (Jan. 31, 2005) (available at http://www.counsel.nysed.gov/Decisions/ volume44/d15164.htm) (ruling on whether a display of candles in high school windows promoted Christianity in violation of the First and Fourteenth Amendments); Appeal of Donna Cayot, 42 Ed. Dept. Rep., Decision No 14,786 (Aug. 22, 2002) (available at http://www.counsel.nysed.gov/Decisions/volume42/d14786.htm) (ruling on whether the singing of the anthem "God Bless America" at a school assembly violated the Establishment Clause of the First Amendment).  However, the Commissioner has recognized that "[a]n appeal to the Commissioner is not the proper forum to adjudicate novel issues of constitutional law or to challenge the constitutionality of a regulation" and thus, "[a] novel claim of constitutional dimension should properly be presented to a court of competent jurisdiction."  Appeal Jay and Lisa Jochnowitz, 46 Ed. Dept. Rep., Decision No. 15,446 (Aug. 21, 2006) (available at

http://www.counsel.nysed.gov/Decisions/volume46/d15446.htm); <u>see</u> <u>also</u> <u>Appeal of J.A.</u>, 48 Ed.

Dept. Rep., Decision No. 15,810 (Aug. 6, 2008) (<u>available</u> <u>at</u> http://www.counsel.nysed.gov/

Decisions/volume48/d15810.htm).

     However, New York courts have held that while "[t]he general rule is that an appeal to

the commissioner is the exclusive remedy where the issue involves the professional judgment

and discretion of those responsible for the administration of public schools," in cases "[w]here []

a statutory or constitutional provision is the basis of the dispute or where discrete issues of law

are present which do not involve matters of policy, review . . . by the courts is proper." <u>Walker</u>

<u>v. Board of Education</u>, 78 A.D.2d 982, 983 (4th Dept. 1980). <u>See</u> <u>also</u> <u>H. v. New York Medical</u>

<u>College</u>, 88 A.D.2d 296, 299 (2d Dept. 1982) ("We recognize that in cases where the issue

involves the professional judgment and discretion of educators *and a statutory or constitutional*

*provision is not the basis of the dispute and discrete issues of law are not present*, direct review

by the courts of the academic policy decisions of educators and educational institutions will not

be proper") (emphasis added); <u>Rackmyer v. Gates-Chili Cent. School Dist.</u>, 48 A.D.2d 180, 183

(4th Dept. 1975) ("[W]here rights depend upon the interpretation of a statute which it is claimed

the school board or an official has violated, the courts will determine the matter notwithstanding

that another procedure for settling the controversy is available.").

     Here, the resolution of the Plaintiff's Equal Protection claim will clearly depend on the

interpretation of a constitutional provision. Moreover, the Plaintiff's claim does not involve

technical or policy considerations within the Commissioner's particular field of expertise, but

rather is within the conventional wisdom of this Court. <u>See</u> <u>Schiller</u>, 449 F.3d at 295.

Accordingly, the Plaintiff was not required to appeal to the Commissioner of Education and

review of the Defendants' actions by this Court is proper.

Further, the Court notes that the Commissioner of Education would be unable to provide the Plaintiff redress for his Equal Protection claim, because the Plaintiff seeks  injunctive relief, compensatory damages and punitive damages for the alleged violation of his constitutional rights that has already occurred.  As such, "the primary jurisdiction doctrine does not require [that the Plaintiff] resort" to the Commissioner, as the Commissioner "has no jurisdiction over the relief sought and cannot provide an adequate remedy."  New York v. Joseph L. Balkan, Inc., 656 F. Supp. 536, 549 (E.D.N.Y. 1987).  See also  Whitaker v. Board of Higher Education, 461 F. Supp. 99, 108-109 (E.D.N.Y. 1978) ("There being no administrative remedy open to this plaintiff, neither the exhaustion nor primary jurisdiction doctrine applies.") (internal citation and quotation marks omitted).

**2.  The Plaintiff Has Stated an Equal Protection Claim**

The Defendants also challenge the Plaintiff's first cause of action on the ground that the Plaintiff has failed to state an Equal Protection claim.  In this regard, the Defendants argue that the Plaintiff "wholly fails to allege any . . . discriminatory motivation on the part of [the D]efendants or any similarly situated individuals treated differently on account of religion." (Def. Memorandum in Support, pg. 14.)  On the other hand, the Plaintiff asserts that his Complaint does state an Equal Protection against the Defendants because it establishes that the Defendants acted with "deliberate indifference" to the anti-Semitic harassment that was occurring at Northport High School.

Under the Equal Protection Clause of the Fourteenth Amendment, a state may not "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIC, § 1.  ""To maintain an equal protection claim," a Plaintiff must "show adverse treatment of individuals compared with other similarly situated individuals and that such selective treatment

was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Miner v. Clinton County, 541 F.3d 464, 474 (2d Cir. 2008).  See also Ortiz v. Vill. of Monticello, 06 Civ. 2208 (ER), 2012 U.S. Dist. LEXIS 158428, at *42-43 (S.D.N.Y. Nov. 2, 2012).  Thus, in order for a plaintiff to state a religion-based claim under the Equal Protection Clause, he must plausibly allege that the defendants "intentionally discriminated against [him] on the basis of [his] religion."  Kiryas Joel Alliance v. Vill. of Kiryas Joel, No. 12-217-cv, 2012 U.S. App. LEXIS 18946, at *13 (2d Cir. Sept. 10, 2012) (citing Knight v. State Dept. of Pub. Health, 275 F.3d 156, 166 (2d Cir. 2001); see also Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 139-140 (2d Cir. 1999) ("In order for plaintiff to prevail on his claims for violation of the Fourteenth Amendment's Equal Protection Clause  . . .  proof of [] discriminatory intent is required.").

In its recent decision in DiStiso v. Cook, 691 F.3d 226 (2d Cir. 2012), the Second Circuit found that "claims of intentional [] discrimination can be based on the 'deliberate indifference' of school boards, administrators, and teachers to invidious harassment, in the school environment, of a student by other children or parents."  Id. at 240-41.  See also Gant, 195 F.3d at 140 ("[I]n cases of alleged student-on-student harassment, only deliberate indifference to such harassment can be viewed as discrimination by school officials themselves.").  In DiStiso, the plaintiff brought an Equal Protection claim against the Town of Wolcott, Connecticut, its Board of Education and various named educators and administrators for the alleged race-based harassment her biracial son suffered in his kindergarten and first-grade classes.  691 F.3d at 228. The Court, relying on its previous decision in Gant, 195 F.3d, held as follows:

> [T]o succeed on a § 1983 equal protection claim of deliberate indifference to student-on-student racial harassment, well established law requires a plaintiff to prove (1) that the child in question was in fact harassed by other students based on his

13

race; (2) that such race-based harassment was actually known to
the defendant school official; and (3) that the defendant's response
to such harassment was so clearly unreasonable in light of the
known circumstances as to give rise to a reasonable inference that
the defendant himself intended for the harassment to occur. In
identifying these elements, <u>Gant</u> emphasized that deliberate
indifference is not a mere reasonableness standard that transforms
every school disciplinary decision into a jury question. Rather,
consistent with the well-established requirement that an equal
protection violation be intentional or purposive, the <u>Gant</u> elements
work together to ensure that the ultimate inquiry in a deliberate
indifference case is one of racially discriminatory purpose on the
part of the defendant himself.

<u>DiStiso</u>, 691 F.3d at 241 (citations and internal quotation marks and alterations omitted).  Of

import, "[d]eliberate indifference will often be a fact-laden question, for which bright lines are

ill-suited."  <u>Tesoriero v. Syosset Cent. Sch. Dist.</u>, 382 F. Supp. 2d 387, 398 (E.D.N.Y. 2005)

(citation and internal quotation marks omitted).

   Thus, relying on the Second Circuit's holding in <u>DiStiso</u>, this Court finds that the

Plaintiff has alleged facts in his Complaint that, if true, state an Equal Protection claim of

deliberate indifference.  First, the Plaintiff's Complaint details that the Plaintiff was not only

harassed based on his religion, "not only experienced student-on-student harassment based on

[his religion], but that this [] harassment was 'so severe, pervasive, and objectively offensive' as

to have deprived the child 'of access to the educational opportunities or benefits provided by the

school.'" <u>DiStiso</u>, 691 F.3d at 241 (quoting <u>Gant</u>, 195 F.d at 140 n. 5).  Indeed, the anti-Semitic

slurs that the Plaintiff claims to have endured from his classmates are without doubt extreme,

outrageous and hateful.  Not only did the Northport High School students bully the Plaintiff

using anti-Semitic stereotypes, they also harassed him with deplorable insults about the

Holocaust, one of the worst tragedies in history and an understandable area of sensitivity for the

Jewish community in particular.  Further, the Complaint suggests that the religion-based

14

harassment continued throughout the Plaintiff's freshman year at Northport High School, whether he was at track practice, in the cafeteria for lunch or in the corridors between classes. In fact, this anti-Semitic harassment became so persistent and severe that the Plaintiff wrote an essay for his English class about the anti-Semitism he had encountered at school.

Second, the Plaintiff's Complaint asserts that the Defendants had actual knowledge of the anti-Semitic bullying that the Plaintiff was suffering by his classmates. In January 2011, the Plaintiff's English essay on anti-Semitism detailed the specific incidents of religion-based harassment he had been subjected to while attending Northport High School. His English teacher allegedly reviewed this essay. In addition, he re-submitted this same essay toward the end of the school year. Moreover, the Plaintiff and his parents met with McDermott and McLaughlin to discuss the harassment in May 2011. At the meeting, the Plaintiff and his parents gave McDermott and McLaughlin a list of the anti-Semitic jokes that had been directed at him. They also gave McDermott and McLaughlin a list of the anti-Semitic Facebook messages of his classmates, which implies that McDermott and McLaughlin received the names of at least some of the Plaintiff's harassers at this time. The Complaint further states that another Northport High School teacher witnessed the anti-Semitic bullying of Plaintiff during the week of June 6, 2011 and that the school's social worker spoke to McLaughlin specifically about the anti-Semitic slurs being made to the Plaintiff at track practice.

Lastly, the Court finds that the Plaintiff alleges facts in his Complaint that would indicate that the Defendants' response was clearly unreasonable in light of the known circumstances. As an initial matter, the Plaintiff's Complaint describes specific incidents of anti-Semitic bullying that occurred on school grounds. "Because school officials are charged with prescribing and controlling conduct in the schools, the District had disciplinary oversight over the harassers.

15

Hence, the District had substantial control over the harassment." <u>Zeno v. Pine Plains Cent. Sch.</u>

<u>Dist.</u>, Docket No. 10-3604-cv, 2012 U.S. App. LEXIS 24833, at *29 (2d Cir. N.Y. Dec. 3, 2012)

(citation and internal quotation marks and alterations omitted).  Further, according to the Second

Circuit, "[r]esponses that are not reasonably calculated to end harassment are inadequate."  <u>Zeno</u>,

2012 U.S. App. LEXIS  at *33.  However, "the school's action—or inaction—must, at a

minimum, cause students to undergo harassment or make them liable to or vulnerable to it."  <u>Id.</u>

at *23 (internal citation omitted).

      In this case, the Plaintiff claims that the Defendants' response was inadequate because

they took no action at all to address the anti-Semitic harassment the Plaintiff was facing, despite

statements by McDermott and McLaughlin that they would do so.  Given the severe and

shockingly offensive nature of the anti-Semitic slurs allegedly being made to the Plaintiff by

other students, it appears to this Court that the supposed lack of action by the Defendants to

either educate students about the harms of such religious discrimination or investigate and

discipline the harassers was an inadequate response and thus, clearly unreasonable.  <u>See</u> <u>DiStiso</u>,

691 F.3d at 244-45 (finding on a summary judgment motion that material factual questions exist

as to the reasonable response element of the plaintiff's deliberate indifference Equal Protection

claim where the defendants did nothing in response to kindergarten complaints of racial name-

calling and did not conduct a full investigation of the incidents); <u>Tesoriero</u>, 382 F. Supp. 2d at

399 (applying the <u>Gant</u> deliberate indifference standard to a Title IX hostile educational

environment harassment claim and holding  "where an educational institution either fails to act,

or acts in a way which could not have reasonably been expected to remedy the violation, then the

institution is liable for what amounts to an official decision not to end discrimination.") (citation

and internal quotation marks omitted).

16

As such, since the Plaintiff's Complaint sufficiently address all three of the necessary elements to state an Equal Protection claim based on deliberate indifference, the Court denies the Defendants' motion to dismiss the first cause of action.

**C.  As to Whether the Plaintiff's Second Cause of Action Should be Dismissed**

The Defendants also argue that the Court should dismiss the Plaintiff's second cause of action, which states an Equal Protection claim under Article 1, Section 11 of the New York State Constitution, because the Plaintiff did not comply with New York State's notice-of-claim statutes.  In this regard, the Defendants allege that the Plaintiff failed to appear for a 50-h examination as required by New York General Municipal Law ("N.Y. Gen. Mun. Law") § 50-h(1).  More specifically, according to the Defendants, on or about October 28, 2011, the Plaintiff advised the Defendants that he intended to file a federal lawsuit and, therefore, would not be appearing for the mandated 50-h examination. (See Decl. of Anthony Cardoso, ¶¶ 4, 6.)  The Plaintiff concedes that he did not appear for a 50-h examination.

"Generally, under [New York Education Law] Section 3813(1), a plaintiff seeking to proceed in court against a school district must present a written verified claim to the governing body of the school district within three months of the claim's accrual."  Flaherty v. Massapequa Pub. Schs., 752 F. Supp. 2d 286, 292 (E.D.N.Y. 2010).  However, in cases involving state tort claims, "[s]ection 3813 provides that 'a notice of [tort] claim shall have been made and served in compliance with section fifty-e of the general municipal law.'" Courtemanche v. Enlarged City School Dist., 686 F. Supp. 1025, 1033 (S.D.N.Y. 1988) (quoting N.Y. Educ. Law § 3813(2)).  N.Y. Gen. Mun. Law § 50-e requires that a plaintiff, prior to bringing a tort action against a school district or its employees, serve a notice of claim within ninety days after the claim arises.  This notice-of-claim provision extends to state constitutional torts.  See South Salina Street, Inc.

17

v. City of Syracuse, 68 N.Y.2d 474, 503 N.E.2d 63, 510 N.Y.S.2d 507 (1986)).  See also

Felmine v. City of New York, 09-CV-3768 (CBA)(JO), 2012 U.S. Dist. LEXIS 77299, 21-22

(E.D.N.Y. June 4, 2012); Pratt v. Indian River Cent. Sch. Dist., 803 F. Supp. 2d 135, 146

(N.D.N.Y 2011).

      After a notice of claim is filed against a school district, N.Y. Gen. Mun. Law § 50-h(1),

which is at issue here, provides that "the . . .  school district shall have the right to demand an

examination of the claimant[.]"  "Where a demand for examination has been served . . . no action

shall be commenced against the . . . school district against which the claim is made unless the

claimant has duly complied with such demand for examination."  N.Y. Gen. Mun. Law § 50-

h(5).

      As an initial matter, the Court finds that it does not actually need to reach the question of

whether or not the Plaintiff's failure to comply with § 50-h is fatal to his claim under the New

York State Constitution.  This is because "various federal courts in this circuit have held that

'there is no private right of action under the New York State Constitution where, as here,

remedies are available under § 1983.'" Clayton v. City of Poughkeepsie, 06 Civ. 4881 (SCR),

2007 U.S. Dist. LEXIS 55082, at *21-22 (S.D.N.Y. June 21, 2007) (quoting Devito v. Barrant,

No. 03-CV-1927 (DLI)(RLM), 2005 U.S. Dist. LEXIS 22444, at *24 (E.D.N.Y. Aug. 23, 2005)

(in turn citing Flores v. City of Mount Vernon, 41 F. Supp. 2d 439, 446-47 (S.D.N.Y. 1999)).

See also Felmine v. City of New York, 09-CV-3768 (CBA)(JO), 2012 U.S. Dist. LEXIS 77299,

at *17 (E.D.N.Y. June 4, 2012) ("New York courts will only imply a private right of action under

the state constitution where no alternative remedy is available to the plaintiff."); Coakley v.

Jaffe, 49 F. Supp. 2d 615, 628 (S.D.N.Y. 1999) ("Although the New York Court of Appeals has

recognized a narrow private right of action for violations of the search and seizure provision of

the state constitution, it is unavailable where an alternative remedy will adequately protect the interests at stake[.]") (citation and internal quotation marks omitted).

In this case, the Plaintiff brings an Equal Protection claim under the Fourteenth Amendment to the United States Constitution pursuant to § 1983; this claim is identical to the one he brings under the New York State Constitution's Equal Protection Clause.  Thus, "[b]ecause all state constitutional law claims are also asserted as Section 1983 claims, all such claims are dismissed."  Krug v. County of Rennselaer, 559 F. Supp. 2d 223, 248 (N.D.N.Y 2008).

Nevertheless, the Court notes that New York State's notice-of-claim statutes, including N.Y. Gen. Mun. Law § 50-h, appears to apply to the Plaintiff's state constitutional claim.  As abovementioned, the Plaintiff's second cause of action asserts a claim under Article One, Section 11 of the New York State Constitution.  That provision provides:

> No person shall be denied the equal protection of the laws of this state or any subdivision thereof.  No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state.

The Plaintiff seeks compensatory damages against the Defendants for their alleged violations of this provision.  (See Pl. Compl., "RELIEF SOUGHT.")  Accordingly, the Plaintiff has asserted a state constitutional tort claim.

As a consequence, the Plaintiff's failure to appear for a 50-h examination is fatal to his second cause of action.  See Boone v City of New York, 92 A.D.3d 709, 710 (N.Y. App. Div. 2d Dep't 2012); Gravius v County of Erie, 85 A.D.3d 1545 (4th Dept. 2011); Bernoudy v. County of Westchester, 40 A.D.3d 896, 897 (2d Dept. 2007).  The Plaintiff's argument that the notice-of-claim provisions do not apply to the individual Defendants, McDermott and McLaughlin,

because some of their actions might have been conducted outside the scope of their employment is unavailing, since his Complaint specifically alleges that "[a]t all relevant time[s], the Defendants who are employees of the School District were acting within the scope of their employment."  (Pl. Compl., ¶ 67.)

In addition, while "the [New York] Court of Appeals has carved out one exception to the notice requirement" for "those actions that seek vindication of a public interest," Biggers v. Brookhaven-Comsewogue Union Free Sch. Dist., 127 F. Supp. 2d 452, 455 (E.D.N.Y. 2001), "the public interest exception does not apply when plaintiffs are seeking money damages for the sole purpose of redressing plaintiffs' individual injuries," Atkins v. County of Orange, 251 F. Supp. 2d 1225, 1235 (S.D.N.Y. 2003).  Here, the Plaintiff is only seeking redress for his individual injuries; that is, he seeks, in relevant part, (1) a declaration that the Defendants violated his legal rights; (2) a permanent injunction requiring the Northport School district to take appropriate steps to remedy the deprivation of his rights; and (3) compensatory damages against the Defendants for their violation of the New York State Constitution.  "While it may be true that a victory for the [P]laintiff in this case may have a positive effect" on ending anti-Semitism at Northport High School, it does not appear that the effect would be of any greater value to the public than any other Plaintiff seeking relief under the New York State Constitution's Equal Protection Clause. Finley v. Giacobbe, 827 F. Supp. 215, 220 (S.D.N.Y. 1993).  See also Moore v. City of New York, 08 Civ. 8879 (PGG), 2010 U.S. Dist. LEXIS 19183, at *31-32 (S.D.N.Y. Mar. 1, 2010) (holding that recovery of compensatory damages and injunctive relief for the plaintiff were private interests).

Therefore, since "these are private interests," the Court finds that the Plaintiff does not seek to vindicate the public interest and, thus, the public interest exception to New York State's

notice-of-claim statutes, including § 50-h, is inapplicable.  Moore, 2010 U.S. Dist. LEXIS 19183 at *31-32 (citation and internal quotation marks omitted).

**D.  As to Whether the Plaintiff's Third Cause of Action Should be Dismissed**

The Plaintiff's third cause of action seeks compensatory damages for McDermott and McLaughlin's alleged violation of § 296(6) of the NYSHRL.  However, because the New York State Court of Appeals' recently held in North Syracuse Central School District v. New York State Division of Human Rights, 19 N.Y.3d 481, 973 N.E.2d 162, 950 N.Y.S.2d 67 (2012) that public school districts are not subject to liability under § 296(4) of the NYSHRL and because individual liability for aiding and abetting pursuant to § 296(6) is predicated upon an underlying violation of the NYSHRL, the Plaintiff has withdrawn his NYSHRL claim.  As such, the Plaintiff's third cause of action is dismissed.

**E.  As to Whether the Plaintiff's Fourth Cause of Action Should be Dismissed**

Finally, the Plaintiff's fourth cause of action seeks compensatory damages for the Defendants alleged violation of NYCRL §§ 40-c and 40-d.   The Defendants argue that the Plaintiff' cannot state a claim under NYCRL §§ 40-c and 40-d because § 40 makes no mention of religion.  However, § 40 of the NYCRL prohibits discrimination on the basis of "race, creed, color, national origin, sex, marital status, sexual orientation or disability."  The Merriam-Webster Dictionary defines "creed" as "a brief authoritative formula of religious belief."  Creed Definition, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/creed (last visited Dec. 17, 2012).  Thus, discrimination based the Plaintiff's religion – that is, his Jewish faith – would fall squarely within the protected categories provided by the NYCRL.  See, e.g., Jews for Jesus, Inc. v. Jewish Community Relations Council, Inc., 79 N.Y.2d 227; 590 N.E.2d 228; 581 N.Y.S.2d 643 (1992) ("The Civil Rights Law . . . prohibits, among other things . . . the

denial of civil rights based on religion.").  As such, the Court denies the Defendants' motion to dismiss the Plaintiff's fourth cause of action.

## III.  CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED** the motion to dismiss the Plaintiff's first and fourth causes of action under Federal Rule of Civil Procedure 12(b)(6) is hereby denied; and it is further

**ORDERED** the motion to dismiss the Plaintiff's second and third causes of action under Federal Rule of Civil Procedure 12(b)(6) is hereby granted.

**SO ORDERED.**
Dated: Central Islip, New York
December 22, 2012

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge